Stephen C. HILBERT; the Thomas C. Hilbert Irrevocable Trust; the Thomas C. Hilbert Irrevocable Trust II; the Stephen C. Hilbert and Stephen C. Hilbert August 1998 Trust; the Todd S. Hilbert Irrevocable Trust; the Christopher L. Myers Irrevocable Trust; and the Heather Dawn Hilbert Irrevocable Trust, Appellants–Defendants,

v.

CONSECO SERVICES, L.L.C., Appellee–Plaintiff.

No. 29A02–0410–CV–895.

Court of Appeals of Indiana.

Nov. 8, 2005.

Daniel P. Byron, Karl L. Mulvaney, Phillip J. Fowler, Bingham McHale LLP, Indianapolis, for Appellants.

Ryan L. Leitch, William P. Means, Jaime L. Meyer, Riley Bennett & Egloff, LLP, Indianapolis, Scott A. McMillin, Kirkland & Ellis LLP, Chicago, for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Stephen C. Hilbert ("Hilbert"), individually, and as trustee for the Thomas C. Hilbert Irrevocable Trust, the Thomas C. Hilbert Irrevocable Trust II, the Stephen C. Hilbert Trust, the Todd S. Hilbert Irrevocable Trust, the Christopher L. Myers Irrevocable Trust, and Heather Dawn Hilbert Irrevocable Trust (collectively, "the

Hilbert Trusts"), and other defendants[1] appeal the trial court's order granting partial summary judgment to Conseco Services, LLC ("Services") on its complaint against Hilbert, the Hilbert Trusts, and the other defendants.[2]

We affirm.

### ISSUES

1. Whether the trial court erred in granting summary judgment because there was a genuine issue of material fact as to Hilbert's liability based on the "change of control" provision in the early stock purchase plans.

2. Whether the trial court erred in granting summary judgment because there was a genuine issue of material fact as to Hilbert's entitlement to equal treatment pursuant to terms of a certain agreement.

3. Whether the trial court's grant of summary judgment must be reversed because Hilbert is not barred from asserting Regulation U as a defense to liability.

### FACTS

In 1979, Hilbert and a partner co-founded Conseco, Inc. ("Conseco").[3] In 1995, with Conseco as its holding company, Services was created as a wholly owned subsidiary to provide administrative services to Conseco.

On March 12, 1996, Conseco's Board of Directors held a special meeting. As Chief Executive Officer of Conseco and Chairman of its Board of Directors, Hilbert explained to the Board that

> the meeting had been called primarily to consider a proposal . . . to establish a plan under which management and Board members could purchase shares of Conseco common stock at current market price with payment for the shares being deferred over several years
> . . . .

(App.447). Hilbert discussed "management's recommendation" for such a plan, and the Board then unanimously passed the resolution to

> adopt a stock purchase plan for participation by its Directors and Senior executive officers under which the participants will be eligible to purchase in open market transactions shares of the Company's common stock with the proceeds of guaranteed financing arranged by the Company.

(App.447, 448).

The initial terms and conditions of the stock plan were set forth in the April 1996 "Conseco, Inc. Director, Executive and

---

**1.** Additional defendant-appellants are Tomisue Hilbert; Thomas C. Hilbert; Christopher L. Myers; the Trust Created Under Article II of the Amended Hilbert Residence Trust Dated August 19, 1999, as Amended; the Trust Created Under Article III of the Amended Hilbert Residence Trust Agreement Dated August 19, 1999; the Tomisue Hilbert First Amended Trust Agreement Dated August 6, 2002; the Stephen C. Hilbert Second Amended Trust Agreement Dated August 6, 2002; and the Hilbert Foundation. The complaint indicates that these parties are named as defendants based upon possible interests in the real estate that is the subject of one count of the action.

**2.** We heard oral argument on September 8, 2005, at Ball State University. We express our appreciation to the University for its gracious hospitality, and we commend counsel for their able presentations.

**3.** According to Hilbert, by 1997, Conseco was "the largest publicly traded life insurance company in America with a capitalization of approximately $14,000,000,000" and "listed on the Standard & Poor's 500 Index." (App. 373).

Senior Officer Stock Purchase Plan." ("1996 Plan"). (App.391). An "amended and restated" plan of August 1997 ("1997 Plan") "completely supersede[d] and replace[d]" the 1996 Plan. (App.399, 406). In July of 1998, the 1997 Plan was "amended and restated" as the "Director, Officer and Key Employee Stock Purchase Plan" ("1998 Plan"), which "completely supersede[d] and restate[d]" the 1997 Plan. (App.418, 426). A "1999 Director and Executive Officer Stock Purchase Plan" was effective September 2, 1999 ("1999 Plan").[4] (App.428). Thereafter, on November 2, 1999, the 1998 Plan was "amended and restated." ("1998 Amended Plan"), and the 1999 Plan was "amended and restated" ("1999 Amended Plan") as well (collectively, "the D & O Plans"). (App.418, 437).

Pursuant to the program established by these D & O Plans, certain banks loaned money to the authorized participants, which included their affiliated trusts; the participants used the money borrowed from these banks to purchase Conseco stock in the open market; and the participants executed promissory notes in favor of the banks for the funds borrowed ("the Principal Notes") and pledged the stock purchased through the program as collateral for the loans. As additional collateral, Conseco guaranteed the participants' obligations on the Principal Notes to the banks. Conseco's guarantees to the banks also contained a "negative pledge" restricting Conseco's ability to grant security interests in its assets. (App.1556). The Hilbert Trusts elected to participate in the D & O Plans, borrowing nearly $162 million through the years 1996, 1997, 1998, and 1999 from the banks to purchase approximately 5.8 million shares of Conseco stock.

The banks charged interest on the loans made to the Hilbert Trusts. However, consistent with the D & O Plans, participants could elect to have Services advance to them the funds to cover the interest and fees charged by the banks on the Principal Notes. The Hilbert Trusts elected to have Services make these payments, and promissory notes were executed in favor of Services to repay the interest advanced on behalf of the Trusts.

In April of 2000, Hilbert and Conseco decided to terminate Hilbert's employment with the company. On April 28, 2000, Conseco accepted Hilbert's resignation as President and CEO. The parties entered into a written agreement ("Termination Agreement") under which Hilbert was to serve as a consultant "during a three year term," i.e., until April 28, 2003. (App.453).

On November 22, 2000, the outstanding promissory notes between the Hilbert Trusts and Services were refinanced.[5] New promissory notes that "supersede[d] and replace[d] all of the currently outstanding promissory notes" were executed in favor of Services ("Services Notes") for the funds Services had already advanced and would advance in the future to pay interest and fees on the bank loans. (App.96, 100, 104, 108, 112, 116). Pursuant to the Services Notes, the Hilbert Trusts unconditionally promised to pay the amounts that had been advanced or would be advanced in the future by Services to the banks. Also on November 20, 2000, Hilbert executed a series of unconditional guarantees ("the Guarantees") in favor of Services wherein he personally guaranteed payment of all liabilities incurred by the Hilbert Trusts, including the liabilities of the Hilbert Trusts under the Services

---

4. This 1999 Plan did not purport to "amend," "restate," "supersede," or "replace" the 1998 Plan.

5. Evidence indicates that the Principal Notes with the banks were also refinanced in November of 2000. (App.1555).

Notes. The maturity date for the Services Notes was February 28, 2001.

On April 3, 2001, Hilbert signed a letter agreement ("the Letter Agreement") in which he agreed to make three payments totaling $17 million [6] to the banks towards the Hilbert Trusts' obligations and to provide Conseco with a mortgage on the Hilberts' Carmel mansion as collateral. In exchange, Services would forgo immediate collection on the Services Notes and would continue to advance funds to cover the interest and fees on the Principal Notes.

On October 16, 2001, Hilbert—as trustee of the Amended Hilbert Residence Trust—also executed a mortgage granting Services a security interest in Hilbert's mansion ("the Mortgage"). Consistent with the terms of the Letter Agreement, the Mortgage "secure[d] performance" of the obligations of the Hilbert Trusts pursuant to the terms of the Services Notes. According to the Mortgage's default terms, upon failure to comply with the terms of the Letter Agreement, "the entire indebtedness shall, at the option of the Mortgagee, immediately become due and payable . . . ." (App.244).

Hilbert made the first two payments ($1 million and $6 million, respectively) as required by the Letter Agreement. However, Hilbert did not make the $10 million payment due in April of 2003.

On October 20, 2003, Services filed a six-count complaint against Hilbert, the Hilbert Trusts, and the other defendants. The complaint included counts asserting (1) a claim for breach of the Service Notes; (2) a claim for breach of the Letter Agreement; and (3) a claim for an order of foreclosure on the Mortgage. Submitted with the complaint were the Services Notes; calculations of the amounts due and owing as of June 30, 2003 on each note; the Guarantees; the Letter Agreement; and the Mortgage (which had been recorded).

On December 4, 2003, Services filed a motion for partial summary judgment on these three counts. Designated evidence in support of Services' motion included the Services Notes; the Guarantees; the Letter Agreement; the Mortgage; and an affidavit by John Kline, senior vice president and chief accounting officer of Services. Services argued that pursuant to the terms of the Services Notes, the Letter Agreement, and the Mortgage, it was entitled to judgment as a matter of law against the Hilbert Trusts; that pursuant to the terms of the Guarantees, it was entitled to judgment as a matter of law against Hilbert; and that pursuant to the terms of the Mortgage, it was entitled to a judgment of foreclosure on Hilbert's mansion.

On December 17, 2003, Hilbert filed an answer of general denial and asserting various affirmative defenses: (1) that the loans from the banks were illegal under a Federal Reserve System regulation known as "Regulation U," and that this illegality excused the obligations of the Services Notes; (2) that a "change of control" provision in the D & O Plans required Conseco to repurchase the stock purchased; (3) that pursuant to the terms of the Termination Agreement, Conseco was required to forgive much of the Hilbert Trusts' debts; and (4) that Conseco fraudulently induced Hilbert and the Hilbert Trusts to execute the Services Notes and Guarantees.

---

6. The first payment, of $1 million, was due immediately, in April of 2001; the second payment, of $6 million, was due in April of 2002; the third payment, of $10 million, was due in April of 2003.

Hilbert sought and was granted six months to conduct discovery and to file a responsive brief. On June 25, 2004, Hilbert filed his response to Services' motion for partial summary judgment. The designated evidence included a seventeen-page affidavit by Hilbert. Also submitted, in support of Hilbert's affidavit and the responsive brief, were *inter alia* the various D & O Plans; confidential Conseco internal documents (submitted under seal); a number of newspaper articles; and transcripts of bankruptcy [7] and other court proceedings. Hilbert argued that the D & O Loans were "void and unenforceable as a matter of law" because they were made by the banks in violation of Regulation U, with the result that no interest could have "lawfully accrued on those loans." (App. 335). Hilbert further argued because all the D & O Plans until the November 1999 amendments had "change of control" provisions, and there had been a "change of control" of Conseco in 2000 and post-bankruptcy, he could only be found liable for the interest owed on D & O Plan stock purchased subsequent to the date he agreed to the amendment—which he entered into believing that its application was prospective from the effective date of November 11, 1999. Therefore, Hilbert's argument continued, there was a disputed material fact as to the amount of interest owed. In addition, Hilbert argued that because the Termination Agreement specified that Conseco would continue to treat Hilbert as it treated other participants in the D & O Plans, and that some of these other participants had had their obligations under the Plans reduced to "less than eight (8) cents on the dollar," there was a disputed material issue of fact as to the interest Hilbert and the Hilbert Trusts owed Services on the loans. (App.347).

Finally, Hilbert argued that based upon Hilbert's affidavit, it was a question of fact for the jury to decide whether the misleading, misrepresented and withheld information from Conseco to Hilbert regarding Conseco's financial condition constituted fraudulent, bad faith, and inequitable conduct such that the doctrine of unclean hands should bar the equitable remedy of foreclosure sought by Services.

Services filed a brief in response, submitting therewith another affidavit by Kline; legal opinions provided to Conseco and the banks as to the compliance with Regulation U of the bank loans for the D & O Plan purchases; the bank agreements; and various other evidence. Services argued that despite Hilbert's extensive brief, lengthy personal affidavit, and voluminous evidentiary submissions, "Hilbert only raise[d] legal issues ... [which] can be disposed of as a matter of law." (App.1057). According to Services' response, *inter alia* Regulation U did not apply to the Services Notes; Hilbert did not have standing to raise Regulation U as a defense to liability; the D & O loans did not violate Regulation U; Conseco's guarantees of the D & O loans to the Plan participant borrowers did not violate Regulation U; and contemporaneous legal opinions and Federal Reserve advice had confirmed compliance with Regulation U. Services also argued that the "change of control" provisions did not apply to the obligations incurred by Hilbert and the Hilbert Trusts and that there had been no "change of control" as defined by the D & O Plans. Further, Services argued that the Termination Agreement was between Hilbert and Conseco, and Services was not a party to it; the Termination Agreement had expired before the adjustments cited by Hilbert had been effected; and that

---

7. Conseco filed for bankruptcy on December 17, 2002; a reorganization plan under Chapter 11 of the U.S. Bankruptcy Code was approved September 11, 2003.

Hilbert had been treated the same as other participants in his circumstances. Finally, Services argued that the fraudulent conduct alleged by Hilbert would not preclude a grant of summary judgment to Services.

Hilbert filed a surreply and submitted another affidavit by Hilbert and other evidence. Hilbert argued that there was "no meaningful distinction between Conseco and [ ] Services for the purposes of the [D & O Plans] and this lawsuit." (App.1990). Hilbert again argued that the D & O Plan loans violated Regulation U, precluding the recovery by Services of any interest; that the amended "change of control" language was only accepted by Hilbert as applying prospectively—after November 8, 1999, and that there had been such a "change of control" at Conseco; that his liability should be reduced consistent with that of other participants; and that the conduct of Conseco and Services precluded foreclosure of the Mortgage.

The trial court held a hearing on September 21, 2004, at which it heard more than two hours of argument from counsel for both sides. Subsequently, the trial court received, "read, and considered" post-trial briefs from both sides. (App.30). On October 20, 2004, the trial court issued its order granting partial summary judgment to Services on its claims for breach of the Services Notes and the Guarantees and for an order of foreclosure on Hilbert's mansion. The trial court found "no dispute between the parties regarding the authenticity of the Services Notes, the [G]uarantees, the [Letter] Agreement, or the Conseco Services Mortgage." (App.33). The trial court also found it undisputed that as of June 30, 2003, Services had advanced more than $62 million on behalf of the Hilbert Trusts; that Services had been paid nothing by either Hilbert or the Hilbert Trusts; that Hilbert failed to make the $10 million April 2003 payment required by the Letter Agreement; and that such failure constituted a default under the Mortgage. The trial court then found that Hilbert's defenses as to Regulation U, the change of control provision, application of the Termination Agreement, and fraudulent inducement[8] had failed as a matter of law. Accordingly, the trial court granted Services an *in rem* judgment against the mortgaged property, Hilbert's mansion; a personal judgment against the Hilbert Trusts in the aggregate amount of $62,712,557.85 as of June 30, 2003, plus interest; a personal judgment against Hilbert as the guarantor in the same amount; and a decree of foreclosure.

## DECISION

Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind. 1992) (citing Ind. Trial Rule 56(C)). The burden is on the moving party to prove there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Id.* Once the movant has sustained this burden, the opponent must respond by setting forth specific facts showing a genuine issue for trial. *Id.*

The trial court's decision on a motion for summary judgment enters the process of appellate review clothed with the presumption of validity. *Id.* The party appealing from the grant of summary judgment must persuade the appellate court that the judg-

---

8. Hilbert does not challenge the trial court's conclusion that his claim of having been "fraudulently induced ... to execute the Services Notes and related guarantees" failed. (App.34).

ment was erroneous. *Id.* As the reviewing court, we face the same issues that were before the trial court, and we follow the same process. *Id.*

In the summary judgment context, the appellate court is not bound by the trial court's specific findings of fact and conclusions of law. *Rice v. Strunk,* 670 N.E.2d 1280, 1283 (Ind.1996). These merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.* Further, we are not limited to reviewing the trial court's reasons for granting summary judgment, and we will affirm a grant of summary judgment if it is sustainable on any theory or basis found in the record. *Stephenson,* 596 N.E.2d at 1371.

 Courts are required to give effect to parties' contracts, and to do so, courts look to the words of the contract. *MPACT Const. Group v. Superior Concrete,* 802 N.E.2d 901, 910 (Ind.2004). When Indiana courts are called upon to interpret a contract, we apply the "four-corners" rule, which "requires that as to any matter expressly covered" in the written contract, "the provisions therein, if unambiguous, determine the terms" of the contract. *East v. Estate of East,* 785 N.E.2d 597, 601 (Ind.Ct.App.2003) (citing *Hauck v. Second Nat'l Bank of Richmond,* 153 Ind.App. 245, 260, 286 N.E.2d 852, 861 (1972)). Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended. *Exide Corp. v. Millwright Riggers, Inc.,* 727 N.E.2d 473, 478–79 (Ind.Ct.App.2000), *trans. denied.* We interpret a written contract by reading the contract as a whole, and we attempt to construe the language so as to not render

any words, phrases, or terms ineffective or meaningless. *Abbey Villas Dev. v. Site Contractors,* 716 N.E.2d 91, 100 (Ind.Ct. App.1999). Thus, we must accept an interpretation of the contract which harmonizes its provisions. *Id.* If the language of the contract is unambiguous and the intent of the parties is discernible from the written contract, the court must give effect to the terms of the contract. *Stenger v. LLC Corp.,* 819 N.E.2d 480, 484 (Ind.Ct.App. 2004), *trans. denied.*

### 1. D & O Plans and the Change of Control Provisions

 According to the 1996 Plan, the 1997 Plan, the 1998 Plan, the 1999 Plan, the 1998 Amended Plan, and the 1999 Amended Plan, Conseco "reserve[d] the right to change or discontinue this Plan by action of the Board of Directors in its discretion" and further "to terminate the Plan." (App.397, 406, 416, 434, 435, 426, 443, 444). As noted above, the 1996 "Director, Executive and Senior Officer Stock Purchase Plan" [9] was "amended and restated" by the 1997 "Director, Executive and Senior Officer Stock Purchase Plan." (App.391, 399). In 1998, the Board adopted the "Amended and Restated Director, Officer and *Key Employee* Stock Purchase Plan," which allowed "a key employee of the company selected by the Directors *or by the Chief Executive Officer* of Conseco" to participate in the plan. (App.408) (emphasis added). In 1999, the Board adopted the 1999 Plan, effective September 7, 1999, with participant eligibility limited to "a non-employee Director of the Company or an executive officer of the Company." (App.428). Finally, on November 2, 1999, both the 1998 Plan and

---

**9.** An eligible participant is defined as "a non-employee Director of the Company, an executive officer of the Company or a senior officer of the Company selected by the Directors." (App.391). This eligibility definition is also found in the 1997 Plan. (App.399).

the 1999 Plan were "amended and re-stated." (App.426, 444).

The 1996 Plan contained a "change of control" provision designated as Section 10. A Conseco "change of control" is defined as "a change of control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934"; or when a person becomes a "beneficial owner" representing 25% or more of the combined voting power of Conseco stock; or when as a result of a

> tender offer, merger, consolidation, sale of assets, or contest for election of directors or any combination of the foregoing transactions or events, individuals who were members of the Board of Directors of Conseco immediately prior to any such transaction or event shall not constitute a majority of the Board of Directors following such transaction or event.

(App.394, 395). The 1997 Plan, 1998 Plan, and 1999 Plan contained the same language, but was identified in those plans as Section 12. (App. 403, 404; 413, 414; 432, 433). The provision further states that when there is such a change of control, each D & O Plan participant "shall be paid" either "the purchase price paid for all of each Participant's Purchased Shares, respectively, plus all interest paid by each respective Participant under the Loan or . . . the amount of the consideration to be paid for the Purchased Shares in connection with the Change of Control," whichever is higher. (App.395, 404, 414, 433).

At a special meeting of the Conseco Board of Directors held on November 2, 1999, "Hilbert, Chairman of the Board, presided" and "discussed the change of control provisions" in Conseco's 1999 Plan and its "Amended and Restated Director and *Key Employee* Stock Purchase Plan," *i.e.* the 1998 Plan. (App.1830) (emphasis added). At the meeting, the Board *unanimously* adopted a resolution to add "to the end of the last sentence of Section 12" of the 1998 Plan this caveat: that Section 12 "shall not apply to any Participant (i) who was a Director and/or executive officer of Conseco as of November 1, 1999 or (ii) who consents in writing at any time to have such provision not apply to such person." (App.1830). The Board also *unanimously* resolved that the 1999 Plan was "amended by deleting in its entirety Section 12 thereof." (App.1831). Thus, the change of control provision contained in the 1998 Amended Plan no longer applied to Hilbert—who at that time was Chairman of the Board of Conseco.[10] Moreover, the 1999 Amended Plan contained no change of control provision. In addition, on November 8, 1999, Hilbert—individually, and as trustee for the Hilbert Trusts—executed "Stock Purchase Plan Consent[s]" stating that he "consent[ed] to the "revision of Section 12" of the 1998 Plan "to provide that such section shall not apply to the undersigned," and further "consent[ed]" to "the deletion in its entirety of Section 12 of the 1999" Plan. (App.1822—1828).

In addition, the D & O Plans contained a provision specifying that despite the Board's discretion to change their terms,

> in the case of any person to whom benefits under this Plan had accrued upon termination of employment prior to such Board of Directors action, or in the case of any Participant who would have been entitled to benefits under this Plan had the Participant's employment ceased pri-

---

**10.** Also, pursuant to the Amended 1998 Plan, the change of control provision in the 1998 Plan no longer applied to any other "Director and/or executive officer of Conseco as of November 1, 1999." (App.1830).

or to such change or discontinuance, the benefits such person had accrued under this Plan prior to such change or discontinuance shall not be adversely affected thereby.

(App.397, 406, 416, 426, 434–35, 443–44). Immediately following is this clause of qualification:

Notwithstanding anything herein to the contrary, nothing contained herein shall restrict the Company's right to terminate the Plan.

(App.397, 406, 416, 426, 435, 444).

According to Hilbert's affidavit, "immediately before" his April 28, 2000 "Termination Agreement,"

Conseco's Board of Directors consisted of [Hilbert], Rollin Dick, Dennis Murray, Ngaire Cuneo, David Decatur, James Massey, Donald Gongaware, David Harkins, Phil Hathaway, John Mutz, Lawrence Coss and Robert Nickoloff.

(App. 377; *see also* App. 692). Only five of these individuals serving on Conseco's Board on April 28, 2000 remained on its Board as of December 12, 2000. Further changes in the Board's composition were made when Conseco emerged from bankruptcy.

As to Hilbert's defense based on the change of control term in the D & O Plans, the trial court concluded as follows:

None of the operative D & O [ ] Plans contain change of control provisions that apply to Hilbert or the Hilbert Trusts. The two operative D & O [ ] Plans (the Amended 1998 and 1999 Plans) were amended and restated to exclude Hilbert and the Hilbert Trusts from the change of control benefits prior to the events that Defendants now contend constituted changes of control. Thus, even if those events constituted a change of control, they would not apply to Hilbert or the Hilbert Trusts. Hilbert executed

written agreements in which he specifically consented to the deletion of the change of control provisions from the Amended and Restated 1999 Plan and the modification of the Amended and Restated 1998 Plan to exclude him from the benefits of the change of control provision. Thus, the Court finds that the change of control provisions have no application to Hilbert or the Hilbert Trusts.

Defendants' contention that these modifications of the two plans applied only to subsequent purchases of the stock, rather than subsequent changes of control, contradicts a plain reading of the D & O Plans in question. Defendants' interpretation would render the effect of the amendments meaningless because all stock purchases under the two plans were completed months before either plan was amended.

The Court finds that there is no genuine issue of material fact on the subject of change of control that would defeat [ ] Services' claims for summary judgment.

(App.37–38).

Hilbert argues on appeal, as he did to the trial court, that once adopted, D & O Plan terms could not be changed retroactively. Thus, according to Hilbert, the 1998 Amended Plan and the 1999 Amended Plan—which, as amended on November 2, 1999, provide that the change of control provision is not applicable to Hilbert *or* is not part of the plan—are only effective prospectively. As a result, he concludes, the change of control provisions in the earlier D & O Plans would apply and relieve him of liability on the Services Notes for stock purchased before November 8, 1999, and the only interest and fees owed to Services on the Services Notes is on "the Hilbert Trusts' post-November 8, 1999 purchases," which interest is in the amount of "$5,761,676 as of June 30, 2003."

(App.381). Therefore, Hilbert concludes, there is a genuine issue of material fact concerning the amount of his liability. We cannot agree.

As already noted, the 1996 Plan, the 1997 Plan, the 1998 Plan, and the 1999 Plan *each* contained a provision whereby Conseco "reserve[d] the right to change or discontinue" or "terminate" the plan by action of the Board of Directors at its discretion. (App.397, 406, 416, 434, 435, 426, 443, 444). The language of the D & O plans crafted by Conseco and presented to its Board by Hilbert—Conseco's co-founder, who was serving as CEO and Chairman of the Board when the Board adopted these plans—expressly provided for the plans to be changed. There is no language in the plans which states that any changes made thereafter would only apply prospectively.

Further, the language of the succession of plans at issue clearly expresses the parties' intent as to the changes made. The initial D & O plan was the 1996 Plan. The 1996 Plan was expressly "amended and restated" by the adoption of the 1997 Plan, which "completely supersede[d]" the 1996 Plan. (App.399, 406). To "amend" is to "change the wording of" or "alter," and to "restate" is to "state again or in a new form." BLACK'S LAW DICTIONARY 80 (7th ed.1999); WEBSTER'S 3D INT'L DICTIONARY 1936 (1976). In *Bielat v. Folta,* 141 Ind. App. 446, 228 N.E.2d 888, 892 (1967), we held that a Supreme Court Rule used the word "supersede" in "its ordinary dictionary meaning, viz: 'To set aside or cause to be set aside as invalid .... to supplant.'" The BLACK'S LAW DICTIONARY meaning of "supersede" is to "annul, make void, or repeal by taking the place of." BLACK'S at 1452. And the dictionary meaning of "completely" is "entirely." WEBSTER'S at 465. Hence, according to the words used by the parties, after the adoption of the 1997 Plan, there no longer was a 1996 Plan because the 1997 Plan expressly changed the wording of the 1996 Plan, stated it in a new form, and entirely repealed it—leaving in its stead the 1997 Plan.

Thereafter, the 1998 Plan stated that it "amended and restated" the 1997 Plan and "completely supersede[d] and restate[d]" the 1997 Plan; hence, at that point there no longer was a 1997 Plan but only the 1998 Plan. (App.418, 426). In September of 1999, a new plan was adopted—the 1999 Plan; the terms of the 1999 Plan did not state that it superseded the existing plan, and its eligible participants were different than those in the 1998 Plan. Thus, in October of 1999, there were in effect two plans: the 1998 Plan and the 1999 Plan. However, on November 2, 1999, those two plans were unanimously amended by the Board—a Board that contained Hilbert as a member, its chairman and the CEO of Conseco. The Amended 1998 Plan expressly and unambiguously states that it "amend[s] and restate[s]" the 1998 Plan, and the Amended 1999 Plan expressly and unambiguously states that it "amend[s] and restate[s]" the 1999 Plan. (App.426, 444).

We read the written contractual terms of the D & O Plans to express the parties' intent that after November 2, 1999, all stock purchased by participants in the D & O stock purchase plans was to be held pursuant to the terms of either the Amended 1998 Plan or the Amended 1999 Plan. Pursuant to the action of the Board on November 2, 1999, neither of those plans contains a change of control provision applicable to Hilbert.

Nevertheless, Hilbert claims that pursuant to *SSD Control Technology v. Breakthrough Technologies, Inc.,* 685 N.E.2d 1136 (Ind.Ct.App.1997), *trans. denied,* the "supersedes" language of the amended

plans is not dispositive. Hilbert cites *SSD*'s statement that "a substituted contract will not result in a party waiving its right to sue under the first contract, unless the substituted contract shows such an intention by the parties." 685 N.E.2d at 1137. However, we believe the meaning of the statement in *SSD* must·be found by reference to its facts, *i.e.*, the facts giving rise to the statement quoted.

In *SSD*, the parties had an initial contract dated September 1, 1995. There arose a dispute about SSD's alleged failure to pay commissions owed under that 1995 contract. On September 1, 1996, at which time disputed commission claims were "already in existence," BTI and SSD entered into a new contract. *Id.* at 1138. The 1995 contract contained a choice of forum provision; the new 1996 contract did not. After the 1996 contract was executed, BTI brought a breach of contract action and sought to invoke the choice of forum provision. SSD cited language of the 1996 contract as follows:

> This Agreement contains the entire agreement of the parties and there are no ·other promises or conditions in any other agreements whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

*Id.* According to SSD, this language extinguished BTI's right to invoke the forum selection clause provision of the 1995 contract. The trial court disagreed, and we affirmed. We noted that the 1996 contract contained "no language stating that BTI waived claims·already in existence against SSD, nor ... language that BTI released SSD from liability existing at the·time the agreement was signed." *Id.* Therefore, "the claims arising under the 1995 contract were not extinguished by the subsequent agreement, and because they arose under the old contract," they were "controlled by its terms." *Id.*

*SSD* applies the law of novation, whereby a subsequent agreement requires "language, either express or implied, which indicates an intention to 'create a novation, relieve contractual liabilities, substitute parties, or extinguish the old contract'" in order to effectively waive a right under the first contract. *Id.* (quoting *White Truck Sales of Indianapolis, Inc. v. Shelby Nat'l Bank*, 420 N.E.2d 1266, 1271 (Ind.Ct.App. 1981)). Here, we do not find the language in the D & O Plans to broadly refer to "other promises or conditions in any other agreement whether oral or written" as in *SSD*. 685 N.E.2d at 1138. Rather, each subsequent D & O Plan agreement contained express language indicating the parties' intent that it "supersede" the specific previous plan; and the 1998 Amended Plan and the 1999 Amended Plan expressed·their intent to "amend and restate" the 1998 Plan and the 1999 Plan. Therefore, consistent with *SSD*, because each subsequent agreement expressed the parties' *intent* to repeal the agreement being amended, it effectively extinguished any claim under the previous agreement.

Moreover, Hilbert does not assert any claim that was "already in existence" *at the time of the November 1999 amendments* to the 1998 Plan and the 1999 Plan so as to invoke application of the change of control provision at that time. *Id.* Indeed, Hilbert's assertion as to a change of control was the changed composition of the Board that occurred in December of 2002 and later.

Hilbert also argues that specific language in the plans "locked-in" certain rights of participants which were provided in the change of control provision. This referenced language stated that despite the Board's discretion to change terms of the D & O plans,

in the case of any person to whom benefits under this Plan had accrued upon termination of employment prior to such Board of Directors action, or in the case of any Participant who would have been entitled to benefits under this Plan had the Participant's employment ceased prior to such change or discontinuance, the benefits such person had accrued under this Plan prior to such change or discontinuance shall not be adversely affected thereby.

(App.397, 406, 416, 426, 434–35, 443–44). However, we do not find this provision apposite to the facts of this case. Hilbert's employment had not been terminated prior to the Board's November 1999 action of amending the plans. Further, as just discussed, there was no claim invoking the change of control provision at the time of the November 1999 amendments. To interpret this provision as meaning that any term of a D & O Plan would forever be preserved if the participant were ever terminated would render meaningless the provision in the 1996, 1997, 1998, and 1999 D & O Plans allowing them to be changed. *See* App. 397, 406, 416, 434. Such an interpretation is unacceptable. *See Abbey Villas,* 716 N.E.2d at 100. Therefore, this provision must be interpreted as allowing a participant whose employment was terminated to invoke a benefit in a provision that has been changed *if* the benefit was one in existence at the time of the change. Because, as already observed, a claimed change of control did not occur before the

1999 amendments, Hilbert's argument in this regard fails.

Finally, Hilbert asserts that even if the terms of the plans allowed for retroactive modification, such modification required that there have been consideration, citing *Hamlin v. Steward,* 622 N.E.2d 535, 539 (Ind.Ct.App.1993). However, in *Hamlin* the original contract did not contain a term stating that the contract could be changed by one party. Here, as repeatedly noted, the 1996, 1997, 1998, and 1999 D & O Plans each contained a term whereby Conseco expressly reserved the right to change the plan—at the discretion of its Board, of which Hilbert was Chairman at the times the changes were made. As we have previously held,

> Fundamental contract law provides that original contracts may provide for modification. A contractual provision so changed is as voluntary and consensual as the original contract.

*Kuehl v. Terre Haute First Nat'l Bank,* 436 N.E.2d 1160, 1162 (Ind.Ct.App.1982).

We find unpersuasive Hilbert's arguments that *SSD* or *Hamlin* would bar the conclusion that as a matter of law, the Amended 1998 Plan and the Amended 1999 plan were the only two operative D & O plans. Further, as already noted, in the case at bar these plans contain no change of control provisions.[11] Therefore, there is no genuine issue of material fact as to the amount of Hilbert's liability on the Services Notes.[12]

---

**11.** Because there was no change of control provision in the operative D & O plans, we need not reach the parties' arguments as to whether there had been an actual change of control as defined in the plans.

**12.** Hilbert also urges that because the trial court relied upon a "false" fact, its ruling on the change of control issue is suspect and "should be reversed." Hilbert's Br. at 27, 37. Specifically, Hilbert cites the trial court's

statement that "all stock purchases" under both the 1998 Plan and the 1999 Plan were completed before the November 1999 amendments. It is true that only purchases under the 1998 Plan had been completed at this time, and that the designated evidence indicates that Hilbert made $20,901.034 in D & O Plan stock purchases subsequent to the November 2, 1999 amendments. However, we have found the express language of the D & O Plans to provide that after

### 2. *Hilbert's Right to be Treated Like Other Employees*

 It is undisputed that on April 28, 2000, Hilbert left the employ of Conseco. The terms of the separation were clearly enumerated in the Termination Agreement between Hilbert and Conseco. Section 1 of the Termination Agreement provided that Hilbert's employment was terminated effective April 28, 2000; Sections 2 and 3 provided for severance and bonus payments to Hilbert; Section 3 provided for Hilbert's resignation from all positions with Conseco; and Section 5 provided that

> the parties have contemporaneously entered into a Consulting Agreement providing, among other things, that [Hilbert] be available to perform specified services during a three year term.

(App.453). Thereafter, Section 7 stated,

> With regard to stock purchases before the Termination Date made by [Hilbert] under the Director and Officer Stock Purchase Plans during the term of the Consulting Agreement [Conseco] will continue to treat [Hilbert] as though he were an employee/participant for purposes of [Conseco's] Director and Officer Stock Purchase Plans and [Conseco's] established practices and accommodations in connection therewith including waivers of any guarantee fees and advancement of any interest payments due.

*Id.*

The bankruptcy plan of September 9, 2003, as approved September 11, 2003, provided that Conseco would offer a stock purchase price adjustment agreement to participants in Conseco's D & O Plans who "purchased 40,000 or less shares." (App. 526). According to the Adjustment Agreement submitted with Hilbert's affidavit, these agreements were offered to eligible participants in the D & O Plans on September 12, 2003. Further, consistent with the bankruptcy plan, "any persons or entities that purchased more than 40,000 shares of Conseco, Inc. common stock and owe amounts" thereon under the D & O Plans, were ineligible for such adjustment agreements. (App.1041). According to Hilbert, Adjustment Agreements participants were allowed to repay their debts for the stock they purchased under the D & O Plans for "pennies on the dollar," and pursuant to the Termination Agreement provision, the same offer should have been made to him.

The trial court concluded as follows:

> By its own terms, the Termination Agreement only required Conseco, Inc. to treat him as an employee during the term of his Consulting Agreement. Defendants do not dispute that the three-year term of the Consulting Agreement expired on April 28, 2003—three years after the Termination Agreement was signed. The Adjustment Agreement about which Hilbert complains was not offered to employees until after Conseco's Plan of Reorganization was confirmed on September 11, 2003, several months after Mr. Hilbert's consulting agreement had expired.

(App.39).

Hilbert argues that despite the fact that the agreements were not offered to participants until September of 2003, the matter was discussed earlier. However, he offers no authority for the proposition that "discussion" of an arrangement renders that arrangement an "established practice[ ],"

November 2, 1999, only the Amended 1998 Plan and Amended 1999 Plan were operative. Therefore, because the trial court's findings of fact are not binding upon us, this argument fails. *See Rice,* 670 N.E.2d at 1283.

which is the language of the provision. (App.435).

To "establish" means to "settle, make, or fix firmly," to "enact permanently" or to "bring about or into existence." BLACK'S at 468. Thus, the language of the provision expresses the requirement that as to Conseco practices that were settled, or set in place, until April 28, 2003 Hilbert would be treated the same as other participants in the D & O Plans. The Conseco practice that allowed adjustment arrangements to some participants was not settled or set in place until after Conseco's plan of reorganization was approved by the bankruptcy court, when those arrangements were offered to the participants. That date was September 9, 2003, which was several months after the three-year term of Hilbert's consulting agreement that is expressly referred to in the provision itself. Therefore, we must give effect to the term of the contract and reject Hilbert's argument. See Stenger, 819 N.E.2d at 480.

Hilbert further claims that his "employee-treatment rights should be extended as a result of" the nine-month long bankruptcy proceedings. (Hilbert's Br. at 42). Again, he offers no authority for this assertion. As Services correctly notes, courts have held that the Bankruptcy Code neither enlarges the rights of a debtor under a contract nor prevents the termination of a contract by its own terms. See In re Advent Corp., 24 B.R. 612, 614 (1st Cir.B.A.P. 1982); In re Tut's Pyramid

Inc., 178 B.R. 867, 871 (Bankr.M.D.Fla. 1995); Advisory Information and Mgmt. Systems, Inc. v. Prime Computer, Inc., 40 B.R. 1001, 1006 (M.D.Tenn.1984). Therefore, we find this argument unpersuasive.

By its own language, the provision that provided what Hilbert refers to as his "equal treatment rights" expired before Conseco allowed some participants in the D & O Plans to adjust their obligations thereon. Therefore, Hilbert's claim that there was a genuine issue of material fact "with respect to [his] 'employee treatment' issue" fails. Hilbert's Br. at 40.[13]

### 3. Application of Regulation U

■ "Regulation U" was issued by the Federal Reserve System pursuant to the Securities Exchange Act of 1934. 12 § C.F.R. 221.1(a). As cited by the trial court, Regulation U provides that no lender "shall extend any purpose credit, secured directly or indirectly by margin stock, in an amount that exceeds the maximum loan value of the collateral securing the credit." 12 C.F.R. § 221.3(a)(1). Further, "margin stock" is defined as "any equity security registered ... on a national securities exchange," and "purpose credit" is defined as "any credit for the purpose, whether immediate, incidental, or ultimate, of buying or carrying margin stock." 12 C.F.R. § 221.2

The trial court found that Regulation U was

---

13. Because we find the plain language of the provision itself dispositive, we do not address Hilbert's argument that the trial court erred when the trial court found that Hilbert's "equal treatment" claim failed not only based on the agreement's "own terms" but also because

Adjustment Agreements were made available to participants who purchased less than 40,000 shares of stock through the D & O Loan Program, without regard to

whether they were current or former employees. Hilbert concedes that his affiliates purchased more than that amount. Thus, Mr. Hilbert was treated identically to employees who had purchased more than 40,000 shares of stock in the program—he was excluded from the Adjustment Agreement. As a result, he was treated the same as all other employees.

(App.39, 39–40).

inapplicable to the Services Notes because (a) those notes were not "purpose credit" extended for the purpose of "buying or carrying margin stock"; and (b) the Services Notes were not secured "directly or indirectly by margin stock." The Services Notes are not margin loans and are not secured by any margin stock. Thus, Regulation U has no application to the Services Notes.

(App.35). The trial court further found that whether Hilbert could assert a "Regulation U defense" was "a question of law to be resolved by the court." (App.35). It then concluded that Regulation U was not a defense available to Hilbert in the action brought by Services.

Hilbert does not directly challenge the trial court's finding that Regulation U does not apply to the Services Notes. In response to Services' observation of this fact, Hilbert responds that his argument as to a Regulation U defense suffices because if the bank loans "are void, no interest is owed on any" debt arising from the loans, (citing *Thompson v. Gasparro*, 257 N.W.2d 355, 356 (Minn.1977)). Reply at 26. Specifically, Hilbert argues as follows: the participants' loans from the banks to purchase stock pursuant to the D & O Plans violated Regulation U; and a provision of the 1934 Securities Exchange Act states that a contract made in violation of a rule

under the Act "shall be void," 15 U.S.C. § 78cc(b). As a result, Hilbert asserts, the banks' loans "were made in violation of Regulation U," and "are therefore void and unenforceable," which means that "no interest expense lawfully accrued on those loans"; hence, Services "was not required to pay any interest" to the banks on those loans. Hilbert's Br. at 49, 51. The trial court held that Hilbert lacked standing to cite Regulation U,[14] but Hilbert argues that despite authority in that regard, cases have held that "a borrower *can* assert a violation of Regulation U as a *defense to liability*." Hilbert's Br. at 50 (emphasis in original).

According to Hilbert, in *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 18–19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Supreme Court held that § 29(b) of the [1934 Act], 15 U.S.C. § 78cc(b), "confers a 'right to rescind' a contract void under the criteria of the statute." Hilbert's Br. at 50. However, we find that what *TAMA* states is that the Supreme Court had "previously recognized that § 29(b) of the [1934 Act], 15 U.S.C. § 78(cc)(b), confers a 'right to rescind' a contract void under the criteria of the statute," citing *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 388, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Further, the case it cited as

**14.** The trial court's order found that Hilbert lacked "standing to assert the defense of regulation U," stating as follows:

Federal Circuit Courts of Appeal that have considered the question have unanimously held that 'borrowing investors' do not have a private right of action under Section 7 of the 1934 Securities Exchange Act (the Section pursuant to which Regulation 7 was promulgated). *Bassler v. Central Nat'l Bank in Chicago,* 715 F.2d 308, 310 (7th Cir.1983). *See also Gilman v. Federal Deposit Ins. Corp.,* 660 F.2d 688, 692 (6th Cir.1981) (holding that "borrowers" did not have a private action under Regulation U); *Bennett v. United States Trust Co. of N.Y.,*

770 F.2d 308, 313 (2nd Cir.1985) (the Second Circuit "agree[d] with the unanimous view of the circuit courts that have subsequently considered the issue and held that there is no implied cause of action for violations of Section 7."); *Amanda Acquisition Corp. v. Universal Foods Corp.,* 708 F.Supp. 984, 993 (E.D.Wis.1989) ("[g]iven the 'strict approach' to implying private rights of action required by *Cort,* and the Seventh Circuit's impliedly 'uninhibited' but vain search for intent in *Bassler,* I must conclude there is no private right of action under § 7.").
(App.35).

having "previously recognized" this right, *Mills*, specifically cited § 29(b)'s statement that contracts made in violation of the Act or a rule thereunder were " 'void . . . as regards the rights of the violator,' " and held that "[t]his language establishe[d] that the guilty party is precluded from enforcing the contract against an unwilling innocent party." 396 U.S. at 387, 90 S.Ct. 616.[15] Thus, the contract would be voidable at the option of the "unwilling innocent party." *Id.* Applying *Mills* to the facts here, it would seem to hold that if the banks violated Regulation U, the banks might not be able to enforce the Principal Notes against an unwilling innocent party. But this is not an action by the banks seeking to enforce those notes. This is an action by Services seeking to enforce the Services Notes and the Guarantees.

Hilbert also cites *Cohen v. Citibank, N.A.*, 954 F.Supp. 621 (S.D.N.Y.1996) to support his position that he can assert violation of Regulation U as a defense. Hilbert does not explain how *Cohen* is helpful to him. *Cohen* does cite both *TAMA* and *Mills*. However, *Cohen* expressly notes *Mills'* holding that an *"innocent party"* has a right to rescind a contract "made void under the criteria of Section 29(b)," which right was "reinforced" by the opinion in *TAMA*. 954 F.Supp. at 626 (emphasis in original).

Even if we were to accept Hilbert's contention that *TAMA, Mills,* and *Cohen* allow him to raise a defense based on his contention that the loans violate Regulation U, we would not find that it requires us to reverse the trial court's order. The designated evidence establishes the undisputed fact that he was Chief Executive Officer and Chairman of the Board of Conseco at the time Conseco obtained the bank loans.[16] Thus, if it were now found that contrary to the opinion of the many experts consulted by Conseco and the banks at the time, the loans were in violation of Regulation U, there is no designated evidence that raises any inference that Hilbert was either an unwilling or an innocent party in the obtaining of the bank loans that he now argues violate Regulation U. Therefore, Hilbert's Regulation U defense argument fails.

The trial court did not err in granting Services' motion for partial summary judgment because the language of the pertinent agreements establish Hilbert's liability on the Services Notes and Guarantees and the inapplicability of the equal treatment provision. Further, Hilbert cannot assert a Regulation U defense. Therefore, the trial court's order is affirmed.[17]

MATHIAS, J., and RILEY, J., concur.

---

**15.** Neither *TAMA* nor *Mills* involved Regulation U.

**16.** According to Hilbert's affidavit, funds for the participants' D & O Plan loans were "made available *to Conseco* by a syndicate of banks." (App.374) (emphasis added).

**17.** Services has filed a motion to strike the references in Hilbert's Reply to the ruling of the trial court in another case in another county. As these references are immaterial to the issues considered by the trial court in this case and to the issues before us, we grant Services' motion. *See* Ind. Appellate Rule 42.