RENDERED: SEPTEMBER 30, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0322-MR

ALLEN FAMILY PARTNERSHIP #1,
LLC, ALISA ALLEN NASH, CHERYL
MELINDA ALLEN, JAN ALLEN
PFEIFER, PATRICIA GAIL ALLEN,
AND TYLER ALLEN,
INDIVIDUALLY AND
DERIVATIVELY ON BEHALF OF
STATION PLACE LLC                                                      APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
                         ACTION NO. 17-CI-001736


WALTER SWYERS AND HYSINGER
GROUP                                                                        APPELLEES


                                    OPINION
           REVERSING IN PART, VACATING IN PART, AND REMANDING

                              ** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; K. THOMPSON AND L. THOMPSON,
JUDGES.

THOMPSON, K., JUDGE:  This appeal asks us to determine whether the Jefferson

Circuit Court correctly interpreted an agreement setting forth the terms for

distributing funds from the sale of an office building in Indianapolis, Indiana. We reverse and remand because the trial court's distribution formula does not follow the agreement's unambiguous terms.

This litigation has been remarkably bitter, sprawling, and protracted. The trial court record is over 8,000 pages long, and there are thousands of additional pages of exhibits and deposition transcripts. To avoid this Opinion becoming unwieldy, we shall discuss only the most necessary facts, procedural history, and issues.[1]

Station Place, LLC owned and operated a commercial office building in Indianapolis (the Building). At one time, Station Place was owned equally by the Allen Family Partnership #1 (the Partnership), Walter Swyers, and the Hysinger Group (Hysinger), but, in 2005, Swyers and Hysinger sold the majority of their ownership interests to Tyler Allen, Patricia Gail Allen, Cheryl Melinda Allen, Jan Allen Pfeifer, and Alisa Allen Nash (the Allens). Thereafter, Swyers and Hysinger each owned 3.3%, the Allens collectively owned 60%, and the Partnership owned 33.4% of Station Place.

Station Place sold the Building in 2017 for $10 million. This action revolves around properly distributing the net funds from that sale.

---

[1] We have considered all the arguments in the parties' original and supplemental briefs but will discuss only those we deem necessary as the remainder are redundant, irrelevant, or otherwise without merit.

Despite the large sums of money at stake, the parties did not draft a pre-sale agreement setting forth in detail how the funds from selling the Building would be distributed. Instead, they agreed to some basic distribution terms in two similar, but not identical, memoranda.

The first memorandum was written in 2007 by Swyers (the 2007 memo) and it contains these relevant provisions:

> Our December, 2005 transaction was based on an $8,000,000 price, postponing any defeasance penalty[2] until the time of ultimate sale to a third party, with each of us then sharing 1/3 each of any proceeds above the $8,000,000 plus the defeasance. [Hysinger] and I [Swyers] each have retained a 3 1/3 % interest in the building. The mortgage . . . balance at time of sale will not be reduced much below the $4,500,000 amount . . . .
>
> The mortgage is payable March, 2011 and at that time there will be no defeasance, therefore, we should have the additional $1,000,000 to distribute 1/3 each, unless it is reduced by a commission on the sale[.]

In August 2010, the parties agreed to another memorandum (the 2010 memo), which the trial court found to be the controlling document. The parties do not dispute that the 2010 memo controls. However, Swyers and Hysinger contend the 2007 memo and 2010 memo together form the operative agreement, an argument with which we do not agree.

---

[2] The parties agree that *defeasance* in this context refers to a penalty for paying off the mortgage before its due date. By the time the Building was sold, the defeasance was no longer relevant.

The 2010 memo provides in relevant part:

> In December 2005, Bill Hysinger and Walt Swyers agreed with Nolen Allen to sell to Nolen's five children 60% of the Station Place interest held by Hysinger/Swyers . . . with the understanding that the transfer was based upon an $8,000,000.00 value and upon ultimate sale of the property, that the Allen interest, Hysinger and Swyers would share proceeds above $8,000,000.00 on a one-third each basis . . . .
>
> Sale of Station Place [*i.e.*, the Building] is expected to occur . . . and the distribution of net proceeds are agreed to be as follows:
>
> 1. A sale up to $8,000,000.00 shall be distributed 33.34% to Allen Family Partnership #1 Ltd; 60% to the Nolen C. Allen family members (12% each) and 3.3% each to Hysinger Group, LLC and Walter J. Swyers, Jr.
>
> 2. If the ultimate net sales price is in excess of $8,000,000.00, Hysinger, Swyers and Allen Family Partnership #1 Ltd shall each be entitled to one-third of net proceeds of the sale in excess of $8,000,000.00[.]

The 2010 memo does not define *net proceeds*; the 2007 memo does not utilize the term *net proceeds*.

After the Building was sold, Swyers, the managing member of Station Place, distributed about $594,695 each to himself and Hysinger. Believing Swyers had overpaid himself and Hysinger, the Partnership and the Allens (collectively Appellants) filed this action against Swyers and Hysinger in the Jefferson Circuit

-4-

Court. The parties agree that Kentucky is a proper venue, but that Station Place's operating agreement requires applying Indiana substantive law.

In addition to numerous other claims, Appellants sought an "accurate accounting of the amount of all Station Place monies that Swyers has advanced to himself since the January 2017 Building sale" and a "detailed statement of the debits and credits between the parties arising from the operation and management of Station Place." Swyers filed counterclaims seeking, among other relief, indemnification. For reasons unclear from the face of the record, the 2010 memo was not produced until after discovery had begun.

During the course of the protracted litigation, the trial court made several pertinent decisions. First, the trial court held that the 2010 memo controls. Also, the trial court held that Swyers had performed in accordance with the 2010 memo, meaning he "did not act with willful misconduct." In other words, the trial court concluded that the non-accounting claims against Swyers were inherently without merit because he had complied with the 2010 memo. Thus, the trial court granted summary judgment to Swyers and Hysinger on all claims against them, except the one seeking an accounting. The court also held that Swyers was a prevailing party entitled to receive indemnification.

In November 2019, the court conducted a two-phase bench trial. The first phase was to ascertain the amount of indemnification owed to Swyers. The

second phase was devoted to Appellants' accounting claim, at which the only witness was an accountant, Faith Crump, called by Appellants.[3]

In her testimony, Crump generally opined that the funds from the sale of the Building should be distributed in accordance with the master settlement statement (the Settlement) prepared in conjunction with that sale. Notably, Swyers signed the Settlement in his role as Station Place's managing member.

On cross-examination, Crump agreed that the only expenses specifically addressed in either the 2007 and 2010 memos were the mortgage, defeasance, and the sales commission. In so doing, she acknowledged that the numerous other costs and expenses listed on the Settlement were not explicitly mentioned in either memo. However, Crump did not meaningfully waver from her core position that all applicable expenses and costs had to be addressed in order to properly calculate the amount of money available for distribution (*i.e.*, *net proceeds*).

---

[3] Generally, an action for an accounting "require[s] a person in possession of financial records to produce them, demonstrate how money was expended, and return pilfered funds in his or her possession. An action for an accounting has the purpose of adjusting the account of the litigants and of rendering complete justice in a single action." 1 AM. JUR. 2d *Accounts and Accounting* § 50 (2022) (footnotes and citations omitted). "Thus, an accounting does not yield a judgment for damages, but rather seeks to restore to the plaintiff what is rightfully his or hers." 1A C.J.S. *Accounting* § 6 (2022). Accordingly, "[a]n accounting is proper where there is an unascertained amount owing that cannot be determined without an examination of the debits and credits on the books to determine what is due and owing." *Id.* Here, the trial court did not conduct a searching examination of Station Place's ledgers, so the bench trial was not a true accounting. Nonetheless, for ease of reference, we shall refer to that phase of the bench trial as an accounting.

The trial court later issued its post-trial decision, the gist of which is its agreement with Swyers and Hysinger that the only costs or expenses which factor into determining *net proceeds* are the mortgage and realtor's commission. Thus, the trial court rejected Appellants' claims that Swyers had overpaid himself and Hysinger and, instead, held that Swyers and Hysinger were each entitled to additional money. Specifically, the court held:

> The mortgage balance of $4,048,272.25 was deducted from the first $8,000,000.00 resulting in the sum of $3,981,727.75 [sic][4] for distribution. Swyers and the Hysinger Group received 3 1/3% in the amount of $131,592.53 each with the balance of $3,688,542.69 going to the Plaintiffs. The sales commission was to be deducted from the sales proceeds in excess of $8,000,000.00, resulting in the sum of $1,700,000.00 for distribution. This sum was to be distributed per the [2010 memo] in thirds. Thus, each party was to receive $566,666.67. Based on these calculations Swyers and the Hysinger Group were to receive a total of $698,259.19 each. Swyers distributed the sum of $594,695 each, leaving for distribution the sum of $103,564.20 each. Ms. Crump confirmed that if the calculations are performed in accordance with the parties' agreement, then "$698,259.19 is what you get."

The trial court also held that Appellees were entitled to a substantial amount of money in indemnification and interest. Appellants then filed this appeal.

Before we may address the merits, we must first resolve Appellees' argument that Appellants failed to preserve the issues for our review. As Swyers

---

[4] The court's math is incorrect. $8,000,000 - $4,048,272.25 = $3,951,727.75.

and Hysinger stress, Appellants now accept the primacy of the 2010 agreement but formerly argued the funds should be distributed differently, such as pursuant to Station Place's operating agreement. Of course, the 2010 memo was not produced until discovery had commenced, as the trial court noted in an order, so we cannot fault Appellants for not initially relying on that document. After the trial court found the 2010 memo controlled, Appellants accepted the ruling but continued to argue that Swyers had overpaid himself and Hysinger. In other words, though some of the finer points of their arguments have evolved, Appellants' core position – they are owed more money and Swyers and Hysinger less – has remained constant.

For example, though it does not specifically cite the 2010 memo, paragraph seventy-eight of the second amended complaint alleges that Swyers "chose to pay himself and Hysinger more than they were owed, and chose to pay Plaintiffs less than they were owed." Similarly, Appellants' prehearing statement in this Court asserts that Swyers gave himself and Hysinger "much more than [their] recoverable interest in the proceeds of the sale" and the trial court "fail[ed] to calculate and incorporate [Appellants'] outstanding amounts owed under the August 11, 2010 agreement[.]"[5]

---

[5] We disagree with Swyers' and Hysinger's assertion that Appellants' briefs impermissibly contain arguments not addressed in their prehearing statement. Prehearing statements are intended to provide the Court with a brief recitation of a party's central arguments. Prehearing

Essentially, Swyers and Hysinger contend that Appellants have violated the principle whereby "a party may not generally assume successive positions in the course of the same litigation with respect to the same fact or set of facts which are inconsistent and mutually contradictory." *Gregory and Appel, Inc. v. Duck*, 459 N.E.2d 46, 50 (Ind. Ct. App. 1984). *See also, e.g.*, *Rowe v. Shepherd*, 283 S.W.2d 188, 190 (Ky. 1955). But we do not perceive that Appellants have adopted inherently contradictory positions since they all along have argued that they received too little money and Swyers and Hysinger too much.

Finally, and crucially, as Appellants correctly note in their reply brief, the trial court held a bench trial on their accounting claims. The purpose of that trial was to ascertain how the funds received from selling the Building should be distributed under the terms of the 2010 memo. Under Kentucky and Indiana law, issues tried by express or implied consent are deemed to have been raised by the pleadings. *See, e.g.*, CR 15.02; *Puckett v. McKinney*, 175 Ind. App. 673, 676, 373 N.E.2d 909, 911 (1978). Therefore, notwithstanding Appellees' disagreement, we deem the issue of proper distribution of *net proceeds* pursuant to the 2010 memo to have been sufficiently raised. After all, that was the sole purpose of the accounting

statements are not intended to be procedural pitfalls; substantial compliance with Kentucky Rule of Civil Procedure (CR) 76.03 is sufficient. *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 197 (Ky. 1994). Appellants' prehearing statement substantially complies with CR 76.03.

phase of the bench trial.  In short, under these unique facts, we deem Appellants'

arguments to have been sufficiently preserved.

Turning to the merits, our review of a decision issued after a bench

trial is as follows:

> Under CR 52.01, the trial court is required to make
> specific findings of fact and state separately its
> conclusions of law relied upon to render the court's
> judgment.  Further, those findings of fact, shall not be set
> aside unless clearly erroneous, and due regard shall be
> given to the opportunity of the trial court to judge the
> credibility of the witnesses.  In fact, judging the
> credibility of witnesses and weighing evidence are tasks
> within the exclusive province *of the trial court.*
>
> If the trial judge's findings of fact in the
> underlying action are not clearly erroneous, *i.e.*, are
> supported by substantial evidence, then the appellate
> court's role is confined to determining whether those
> facts support the trial judge's legal conclusion.  However,
> while deferential to the lower court's factual findings,
> appellate review of legal determinations and conclusions
> from a bench trial is *de novo.*

*Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016) (internal quotation marks,

brackets, and citations omitted).[6]  Because contract interpretation is deemed a

---

[6] Though we accept the parties' agreement that Indiana substantive law controls, "the law of the forum controls remedies and procedures."  *Ley v. Simmons*, 249 S.W.2d 808, 808 (Ky. 1952).  In any event, Indiana's standards of review are similar.  *See, e.g.*, *Carmichael v. Siegel*, 754 N.E.2d 619, 625 (Ind. Ct. App. 2001).  We will apply Kentucky's summary judgment standards. *Lipsteuer v. CSX Transp., Inc.*, 37 S.W.3d 732, 735 (Ky. 2000).

-10-

substantive issue, *Bourke v. Dun & Bradstreet Corporation*, 159 F.3d 1032, 1036 (7th Cir. 1998), we shall apply Indiana contract interpretation principles.

Under Indiana law, a court must give the terms of an unambiguous contract their plain, ordinary meaning. *Reuille v. E.E. Brandenberger Const., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). And if a contract is unambiguous, a court "may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument." *Celadon Trucking Services, Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017). Kentucky law is similar. *See, e.g.*, *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384-85 (Ky.App. 2002).

We begin with a broad overview of what we perceive to be the trial court's two main errors. First, the court should not have adopted the parties' complicated bifurcation for determining and allotting *net proceeds*. Under the parties' approach, the gross sales price was cleaved into two discrete portions – the first $8 million and the remaining $2 million. The mortgage was to be deducted from the first $8 million, with the remaining balance of that portion to be distributed pursuant to the parties' ownership interest in Station Place. The realtor's commission (and, in Appellants' view, sundry other costs and expenses) was to be deducted from the remaining $2 million of the gross sales price, with the remaining balance of that $2 million distributed one-third each to Swyers,

Hysinger, and the Partnership. However, that under/over $8 million bifurcation has no explicit textual support in the plain language of the 2010 memo, and the parties' understanding is not controlling.

Instead, the 2010 memo bases its distribution formulae on whether there were $8 million in *net proceeds*. If not, the memo requires <u>all</u> *net proceeds* to be distributed pursuant to the parties' ownership interests; if so, the memo requires <u>only</u> the *net proceeds* over $8 million to be distributed under the one-third each formula, with the first $8 million in *net proceeds* to be distributed according to the parties' ownership interests. There is <u>nothing</u> in the memo which states that the gross sales price is to be split, with the mortgage being deducted from the first $8 million and the realtor's commission (and other costs) deducted from the remaining $2 million.

In other words, the entire first $8 million of the *net proceeds* must be distributed according to the parties' ownership interests in Station Place. The one-third each formula only takes effect if there are *net proceeds* above $8 million, and only applies to *net proceeds* above $8 million. However, given a $10 million gross sales price and over $4 million in mortgages, basic math shows that there cannot possibly have been $8 million in *net proceeds*:

$10,000,000.00 (gross sales price)
- $3,781,326.44 (first mortgage)
-    $266,945.81 (second mortgage)
-    $300,000.00 (realtor's commission)
  $5,651,727.75 (absolute maximum possible *net proceeds*)

Thus, the one-third each formula never came into play, so the entirety of the *net proceeds* must be distributed according to the parties' ownership interests.

We are aware that this conclusion is not in accordance with the parties' subjective interpretation of the 2010 memo in their briefs (though Appellants seem to recognize in their supplemental brief that there were not $8 million in *net proceeds*). But, under longstanding Indiana precedent, the terms of an unambiguous contract prevail over any contrary, subjective intent of a party:

> It is fundamental that one who executes a contract of a certain character is bound by its terms even though he meant something different and thought the words conveyed his meaning. A court must give effect to the meaning and intent of the parties as expressed in the language of their contract. . . . In absence of anything to show legal impediment to prevent their entering into any contract they see fit or expressing it in the language of their own choice, the rights of the parties must be determined according to the contract. The sole duty of a trial court in a proceeding, such as before us, is to determine what is meant by the language of the instrument. In other words, the object to be attained in interpreting a contract is to ascertain the meaning and intent of the parties as expressed in the language used.

*Miller v. Frankfort Bottle Gas, Inc.*, 136 Ind. App. 456, 460, 202 N.E.2d 395, 397-98 (1964). *See also, e.g.*, 11 WILLISTON ON CONTRACTS, *The parties' expressed*

*intent governs any subjective, unexpressed intent* § 31:4 (4th ed. 2022); *Cantrell Supply, Inc.*, 94 S.W.3d at 385; *Claire's Boutiques, Inc. v. Brownsburg Station Partners LLC*, 997 N.E.2d 1093, 1098 (Ind. Ct. App. 2013). Therefore, since the *net proceeds* did not exceed $8 million, the trial court erred by not allocating them pursuant to the parties' ownership interests, notwithstanding their contrary arguments.

The second main error made by the trial court is accepting Swyers' and Hysinger's argument that the only costs and expenses which may be deducted from the gross sales price to determine *net proceeds* are the mortgages and realtor's commission. That position is unsupported by any specific language in the 2010 memo.

Though it is the contract's key term, the 2010 memo does not define *net proceeds*. The parties could have intended for *net proceeds* to have a specialized meaning since, generally, parties may agree to any contractual terms which do not violate the law or public policy. *See, e.g.*, *Ransburg v. Richards*, 770 N.E.2d 393, 395-96 (Ind. Ct. App. 2002). However, since the plain language of the contract contains <u>nothing</u> showing the parties intended *net proceeds* to have an idiosyncratic meaning, we must use the term's ordinary meaning. *Hilbert v. Conseco Services, L.L.C.*, 836 N.E.2d 1001, 1008 (Ind. Ct. App. 2005).

-14-

We asked for supplemental briefing, mainly on the issue of whether the ordinary definition of *net proceeds* should apply.  The parties seem to agree that it does.

When interpreting a term undefined within a contract, as here, Indiana courts turn to dictionaries for guidance.  *See, e.g.*, *Reuille*, 888 N.E.2d at 771.  Black's Law Dictionary defines *net proceeds* in relevant part as "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)."  *Net proceeds*, BLACK'S LAW DICTIONARY (11th ed. 2019).  A financial dictionary similarly defines *net proceeds* in relevant part as "[t]he money one receives from a transaction after all commissions, fees, and related expenses.  For example, if one sells his/her house, the *net proceeds* are the funds one receives from the buyer after all realtor's fees and other closing costs."[7]  Thus, the definition of *net proceeds* here is the typical  one:  the amount of money remaining for distribution after <u>all</u> applicable expenses and fees have been deducted.

What are the applicable costs and expenses?  Crump did not testify that the mortgages and realtor's commission were the only proper costs or expenses.  Instead, she generally testified that the distribution should align with the

_____

[7] *Farlex Financial Dictionary* (2009), available for viewing at https://financial-dictionary.thefreedictionary.com/net+proceeds (last visited Sep. 9, 2022).  *See also* INVESTOPEDIA https://www.investopedia.com/terms/n/netproceeds.asp. (last visited Sep. 9, 2022) (defining *net proceeds* in relevant part as "the amount the seller receives following the sale of an asset after all costs and expenses are deducted from the gross proceeds").

Settlement, which lists over $1 million in additional costs and expenses. And no other witnesses testified at the accounting trial, so Crump's testimony is essentially unrebutted. In fact, Swyers signed the Settlement, and neither he (nor Hysinger) has explained the dichotomy between his signing a document at or near closing which he now attacks as somehow inapplicable. And there is nothing in the 2010 memo specifically limiting the costs and expenses to be considered when determining *net proceeds*. In sum, the trial court's conclusion that the mortgage and realtor's commission are the only expenses relevant to determining *net proceeds* is unsupported by the plain language of the contract, witness testimony, or the applicable principles of contract interpretation.

The trial's post-trial rulings do not meaningfully discuss the Settlement. Substantively, the trial court held:

> The [$300,000] sales commission was to be deducted from the sales proceeds in excess of $8,000,000.00, resulting in the sum of $1,700,000.00 for distribution. This sum was to be distributed per the August 11, 2010 agreement in thirds. Thus, each party was to receive $566,666.67. . . . Ms. Crump confirmed that if the calculations are performed in accordance with the parties' agreement, then "$698,259.19 is what you get."

The trial court did not address the numerous other costs and expenses listed in the Settlement or Crump's testimony that, generally, a proper distribution should align with the Settlement.

Crump testified that the 2007 memo – upon which the Swyers and Hysinger rely greatly – mentions only defeasance, mortgage, and a realtor's commission. But Crump consistently maintained that all necessary expenses and costs had to be considered to determine *net proceeds* and the distributions should align with the Settlement.[8]

We will not flyspeck the litany of costs and expenses listed on the Settlement. Crump generally testified that the Settlement was the controlling document in determining the relevant costs and expenses, Swyers signed the Settlement, and neither he nor Hysinger presented any witnesses at the accounting trial to contradict Crump. Accordingly, Swyers' and Hysinger's self-serving protestations that the Settlement is incorrect or somehow violates the plain terms of the 2010 memo are belated and unavailing. The roughly $1 million in additional costs and expenses listed on the Settlement must be taken into account. The costs

---

[8] Swyers misleadingly asserts in his brief that Crump admitted that "no expenses, other than the mortgage and the sales commission, should be deducted . . . in order to arrive at Appellees' share of the sales proceeds . . . ." We strongly disagree.

Swyers points to his counsel's asking Crump as recorded on video, whether, in the 2007 memo, "the only expense that is to be taken other than the mortgage if there's no defeasance is the commission, correct? In this letter, the only expense that is supposed to be taken is the commission?" Crump responded, "that's the only one addressed in the letter." In other words, all Crump admitted was an uncontested fact – the realtor's commission and mortgages (along with the defeasance, which had been rendered obsolete) are the only expenses specifically mentioned in the 2007 memo. Crump did not testify that those were the only costs and fees which may be properly considered when determining *net proceeds*, nor can such an inference be reasonably drawn from her testimony.

and expenses listed on the Settlement shall be used on remand to determine the proper distribution of *net proceeds*.

In sum, the 2010 memo is unambiguous. The one-third each clause was never triggered because there were less than $8 million in *net proceeds*. The trial court erred in holding to the contrary, and its decision is thus reversed. On remand, the costs and expenses listed on the Settlement should be subtracted from the gross sales price to determine *net proceeds*, which shall then be distributed according to each party's ownership interest in Station Place.

Finally, our conclusion is not altered by Swyers' and Hysinger's insistence that the 2007 memo also controls. We will not extend this already lengthy Opinion by addressing the 2007 memo in detail as the trial court plainly held that the 2010 memo controls. The 2010 memo is unambiguous, so the 2007 memo is impermissible, extrinsic evidence, Swyers' and Hysinger's arguments to the contrary notwithstanding. *Celadon Trucking Services, Inc.*, 70 N.E.3d at 839.

Nonetheless, even if we were to consider it, the 2007 memo does not change our conclusions. Though Swyers and Hysinger insist that it does, there simply is no explicit statement in the 2007 memo that the realtor's commission, mortgages, and defeasance were the only costs and expenses to be considered when allocating the net funds received from selling the Building. Instead, the 2007 memo discusses the mortgage balances and realtor's commission in its

hypothetical discussion of the amounts which would be available for distribution if the Building were to be sold at various times. It is common knowledge that there are a host of costs and expenses inevitably associated with any real estate transaction. The 2007 memo contains no language whatsoever eliminating those inevitable other expenses from consideration in determining the amount of funds to be distributed after the sale. In other words, discussing the hypothetical impact of a couple of expenses – standing alone – does not eliminate all other expenses from consideration.

Tellingly, Swyers and Hysinger do not cite to specific, concrete evidence to support their assertions that the defeasance, mortgage, and realtor's commission were the only ones relevant under the 2007 memo. For example, while Hysinger's brief argues they are the only relevant costs and expenses, the brief does not cite to any specific portions of the record to support that argument other than Crump's unremarkable acknowledgement that those were the only costs or expenses specifically mentioned in the 2007 memo. We again emphasize that neither Hysinger nor Swyers presented any witnesses at the accounting trial. No matter how vehemently or frequently made, arguments made by counsel are not evidence. *Nevel v. State of Indiana*, 818 N.E.2d 1, 5 (Ind. Ct. App. 2004); *Dixon v. Commonwealth*, 263 S.W.3d 583, 593 (Ky. 2008).

Where does that leave us?  The trial court's conclusions based on the accounting trial are clearly erroneous because they are not supported by the record or applicable contract principles.  Failing to consider all pertinent costs and expenses and applying the inapplicable one-third each formula led the trial court to *significantly* inflate the amount due to Swyers and Hysinger.  In turn, that conclusion caused the trial court to conclude erroneously that Swyers could not be found liable for the non-accounting claims because he had complied with the 2010 memo.  Actually, Swyers significantly overpaid himself and Hysinger and, in so doing, violated the plain terms of the 2010 memo.

We need not delve deeply into the minutiae of the non-accounting claims, given the trial court's holding.  We note that, standing alone, the fact that Swyers overpaid himself and Hysinger is insufficient for Appellants to prevail on their non-accounting claims.  Swyers would likely not be liable on Appellants' claims if he, for example, merely made a good faith mistake in calculating the amount of money due to himself and Hysinger.  Instead, Appellants must generally show that Swyers acted willfully, recklessly, or in bad faith.  Given the concentration on the accounting claim in the parties' briefs, the non-accounting claims received only fleeting attention.  The parties' mistaken interpretation that the one-third each formula did apply likely in part negates the needed showing to the extent that Swyers followed this joint understanding in overpaying.  Thus, it is

sufficient for us to state that the parties have not pointed to evidence showing definitively that Swyers did, or did not, act culpably regarding the non-accounting claims.

In other words, Swyers or Appellants may potentially prevail on the non-accounting claims. At absolute bare minimum, it is certainly not impossible for Appellants to prevail on those claims. Accordingly, the trial court erred by granting summary judgment. *See, e.g.*, *Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 198 (Ky. 2010) (holding that a trial court must view the evidence "in the light most favorable to the nonmoving party" and summary judgment is proper only if, in a practical sense, "it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor") (citations omitted). Therefore, the trial court's decision to grant summary judgment on the non-accounting claims must be vacated and remanded for further proceedings. Appellants seem to concede that their unjust enrichment claims fail in light of the trial court's conclusion that the 2010 memo controls the parties' rights; accordingly, the trial court's denial of this claim is conclusive.

The trial court's erroneous conclusions on Appellants' claims also means the trial court erred when it concluded that Swyers is entitled to indemnification and he and Hysinger are entitled to receive attorney's fees and

interest as prevailing parties. Neither Hysinger nor Swyers should be a prevailing party on the accounting claims, and it is not yet known with certainty who will prevail on the non-accounting claims. Therefore, the trial court's determination that Swyers and Hysinger are entitled to indemnification/attorney's fees and interest is vacated and remanded for further proceedings, which shall be conducted after the non-accounting claims so that it will then be known who has prevailed on those claims.

For the foregoing reasons, 1) the Jefferson Circuit Court's post-trial decision on the accounting claims is reversed. On remand, we instruct the trial court to recalculate *net proceeds* by using the costs and expenses listed on the Settlement, after which the *net proceeds* shall be distributed according to each party's ownership interest in Station Place; 2) the grant of summary judgment on Appellants' non-accounting claims is vacated and remanded for further proceedings; 3) the order awarding Swyers and Hysinger indemnification/attorney's fees and interest is vacated and remanded for further proceedings, to be conducted after the resolution of the non-accounting claims.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Christopher E. Schaefer
Emily P. Mattingly
Louisville, Kentucky

BRIEFS FOR APPELLEE WALTER SWYERS:

William F. McMurry
Mikell T. Grafton
Louisville, Kentucky

BRIEFS FOR APPELLEE HYSINGER GROUP:

W. Edward Skees
New Albany, Indiana